# EXHIBIT
# 3

JAMS ARBITRATION CASE NO. 26637

## BOTANI-LABS, LLC, CLAIMANT V. IPF SOURCING, LLC, RESPONDENT

### FINAL ORDER AND AWARD

### I.    Findings of Fact

1.    This case began as a contract dispute between two entrepreneurial small businesses, both organized as limited liability companies.  As best as I could determine, Claimant Botani-Labs, LLC, a Colorado limited liability company ("Botani") had only one member, Mr. Rico Garcia ("Garcia").  Garcia identified himself as Botani's CEO in the invoice contract and various pleadings, and also signed Botani's Demand for Arbitration with JAMS as its Managing Member.  No other members, officers or other principals of Botani were ever identified.  Respondent IPF Sourcing, LLC, a Virginia limited liability company ("IPF") had four managing members: Mr. Anshu Arora, who also self-identified as its CEO ("Arora"); Mr. Victor Alexandropoulos ("Alexandropoulos"); Mr. Randy Robinson ("Robinson"); and Mr. Don Thomas ("Thomas").  Arora, Alexandropoulos, and Thomas all testified as witnesses at final hearing. Robinson did not.  Also, neither Garcia nor any other representative or witness appeared on behalf of Botani at final hearing, nor was any testimony or other evidence offered on its behalf.

2.    The dispute involves IPF's April 27, 2020 request to purchase from Botani 1,330,000 units of 16 oz. 70% Alcohol Gel Hand Sanitizer with Pump Top, and Botani's April 28, 2020 Agreement to provide the same, at a unit price of $3.75, or a total price of $4,987,500.00.  50% of this total ($2,493,750.00) was to be advanced as a deposit, and the balance was to be paid upon pickup or delivery.   The written terms of their agreement are embodied in Botani's 4/28/2020 invoice to IPF, which contained certain "purchase terms," which was signed by both parties,[1] and which both parties have treated as the valid agreement between them.[2]   (Resp. Ex. 4). (Any reference to exhibits hereinafter will simply be referred to as "Ex. #," unless otherwise indicated, since there are no Claimant's hearing exhibits before me).

3.    IPF describes itself in its pleadings as a "sourcing company" that manufactures, sources and fulfills various products for its clients' needs.  In April 2020, shortly after the United States economy was largely shut down due to the onset of the Covid 19 pandemic, IPF became involved in contract negotiations with a potential client identified as FarFromBoringPromotions.com, LLC ("FFB") to supply FFB with large quantities of hand sanitizer, initially including up to 9,000,000 units of 16 oz. hand sanitizer with pump tops, a product in high demand by the general public at that time.  These discussions contemplated that IPF would supply the first tranche of 1,330,000 bottles of the hand

---

[1] By Arora on behalf of IPF, and by Garcia on behalf of Botani.
[2] Neither party has disputed the requirement that this matter be resolved by binding arbitration, purchase term 6 of the Invoice.  No other documented agreement between them presented to me contains an arbitration clause.

sanitizer to FFB on or about May 4, 2020, with five additional tranches totaling 7,670,000 units to be supplied on a weekly basis through about June 8, 2020. IPF, as a sourcing company, then contacted Botani as a possible source to supply the hand sanitizer sought by FFB. [3]

4.    IPF's initial contact with Botani occurred in mid-April 2020, between Thomas, who had been involved in one or two earlier transactions with Botani, and Garcia. Most of the discussions, however, were between Garcia and Arora, the two CEOs. Arora testified that he fully explained IPF's pending transaction with FFB, and Garcia assured him that Botani had the capacity to supply the entire 9,000,000 units of requested hand sanitizer within the time frame IPF was to supply it to FFB. IPF informed Garcia of the terms of IPF's Agreement with FFB, including the scheduling and payment specifics of a work order reflecting the time schedule by which IPF was to supply the 9,000,000 units, specifically including a first batch or "tranche" of 1,330,000 units to be supplied by about May 4, 2020. Garcia specifically assured Arora that Botani could supply this first tranche within 7-14 days after formation of a contract and receipt of a requested deposit, and the remainder of the units in accordance with the specified work order. Thomas and Alexandropoulos also both testified that they discussed the expected delivery time for the first tranche and gave basically the same account as Arora.

5.    A verbal understanding was quickly struck between IPF and Botani. On April 28, 2020 the following events occurred, based on the dates and contents of the respective documents:

A.    IPF sent two Purchase Orders signed by Thomas, with an explanatory e-mail to Botani and Garcia: (i) one for purchase of the first tranche of 1,330,000 units, reflecting the 50% deposit; and (ii) one for purchase of the entire 9,000,000 units (Ex. 3).

B.    Botani in response sent its Invoice document #042920 dated 4/28/20 to IPF for the first tranche of 1,330,000 units at $3.75 per unit, for total price of $4,987,500, less the deposit amount of $ 2,493,750, for a total of $2,493,750; this invoice contained certain preprinted "Purchase Terms," is signed by both parties, and represents the written contract between them. (Ex.4) The exhibit also contains a Signature Certificate from Panda.Doc.com certifying to the signatures of both Arora and Garcia.

C.    Rico Garcia on behalf of Botani-Labs, LLC electronically signed a Paymaster Service Agreement with the Walckner Law Office of Worcester, Mass., described as a neutral third party, governing the secure transfer of funds from Depositors to Recipients in "transactions concerning purchases, service contracts, construction projects, and management of investor funds." (Ex.6).

D.    IPF, by CEO Arora, e-mailed to James Walckner, the following message:

"James,

---

[3] The transaction was even more complex, in that FFB had some relationship with, or may have been acting as a sourcing company for, an entity known as SZY Holdings, LLC. SZY Holdings may have been the original source of the purchase funds, but I was not presented with any evidence of a contractual or other relationship between IPF and SZY.

Per IPF Sourcing LLC's agreement with the buyer and investor, I am authorizing the release of funds in the amount of $2,493,750.00 to Botani-Labs LLC to begin production of the hand sanitizer order. Please call me with any questions." (Ex. 5).

6.      On April 29, IPF through managing member Thomas sent Garcia at Botani a "vector file" and a .pdf file for creating the proper private label to be affixed to the 9 million units to be manufactured or procured, along with instructions as to how to modify the sample label "to actually reflect the MSDS for their formulation." (Ex.8).   That same day, IPF through managing member Alexandropoulos sent Garcia a 9-page Safety Data Sheet,  dated April 25, 2020, complete except for identification of the manufacturer's name and address on page 1 (Ex. 9).

7.      On April 29, the Walckner Law Office through James Walckner instructed transfer from its Paymaster Service account to Botani-Labs LLC's account at JP Morgan Chase Bank of Denver, Colorado. (Ex.10).   Botani's account at the same bank was credited in the amount of $2,493,750 on the same date. (Ex.15).

8.      Subsequent to signing of the April 28 Invoice contract and April 29 transfer of the deposit funds to Botani's Colorado account, there were apparently a number of e-mail, text messages, and telephone calls  between Botani (Garcia) and Arora, Alexandropoulos, or Thomas, the three IPF managing members who  testified at final hearing.  The gist of these communications was that Botani was having some difficulties obtaining the product.  Among other asserted reasons for delay was that Botani had in turn contracted to obtain the hand sanitizer product from a source in China, about which IPF had not been previously informed.   Garcia asserted he had sent the deposit funds to one HUI LIN in China, and that the Chinese source was having difficulty getting the proper pump tops for the units. Garcia at first acknowledged that Botani would supply the first tranche of the product for which the deposit had been made within the agreed 7-14 day period.  When this did not occur, Garcia advanced other reasons why the product had not yet been manufactured or obtained, but avoided providing a specific date as to when performance would actually occur.

9.      On May 26, Arora sent a short e-mail to Garcia, asking if he had any updates on potential pickup of the first tranche of product (Ex. 11).    I have no evidence that Garcia or Botani ever responded to this e-mail.

10.      By letter dated June 10, 2020, IPF's legal counsel[4] recited the difficulties it was having with its upstream customer because of Botani's delayed performance, also recited several resolutions of the delay which IPF had earlier proposed but which Botani had rejected, and demanded that Botani deliver or make available for pick-up the first tranche of hand sanitizer, on which the 50% deposit had already been made, within the next 14 days, on or before June 24, 2020.  IPF characterized this as a "reasonable period," to obtain performance, and declared that if performance did not occur by that date it would terminate the existing contract and demand return of the deposit money.   It also requested that, if Botani had knowledge it could not perform by June 24, it should immediately so notify

---

[4] John A.Bonello, Esq. and the law firm of David, Brody & Dondershine, LLP of Reston, Virginia.

IPF, on or before June 12, so that IPF could seek other vendors to meet its obligations to its customer. (Ex. 12)

11.    I have no evidence that Botani responded to this notice letter either by June 12 or thereafter.  Meanwhile, by e-mail and Federal Express letter dated June 12, 2020, IPF was notified by attorneys for SZY Holdings, LLC, reciting that SZY was an assignee of FFB's sourcing contract with IPF, and that SZY was terminating that contract and demanding return of advanced funds for IPF's failure to perform on its Product Distribution Agreement. (Ex. 13).[5]

12.    Botani neither responded to IPF's June 10 written notice to it nor performed as requested.   On June 25, IPF declared the contract terminated and demanded return of the $2,493,750.00 deposit, stating that if the deposit money was not returned by June 29, it would initiate an arbitration proceeding. (Ex. 14).  However, on June 27, 2020, Botani filed its own arbitration demand with JAMS in Colorado, naming IPF as the Respondent.  IPF filed its arbitration demand with JAMS in Virginia on 6/30/2020, naming Botani as the Respondent.

13.    By notice dated July 9, 2020, the JAMS General Counsel and Co-Chair of the JAMS National Arbitration Committee consolidated these two demands pursuant to JAMS Comprehensive Rule 6(e), designated Botani's first-filed Demand as the captioned case with Botani as Claimant, and treated IPF's subsequent demand claims as counterclaims by Respondent.   Pursuant to JAMS Comprehensive Rule 1(d), the case was assigned for administration by the JAMS Resolution Center in Denver, Colorado.

## II.    Claims and Counterclaims at Case Commencement and at Final Hearing, and Intervening Events

14.    Both Botani and IPF originally stated their competing arbitration demands in narrative rather than pleading form, making it difficult to understand just what claims for relief each was asserting.  At the December 14, 2020 first preliminary teleconference and in my Order No. 1 of that date, I ordered both parties to restate their demands in pleading rather than narrative form, so that both sides could be clear as to what the other was asserting and what were the specific claims for relief. At that time, both parties were represented by legal counsel.  The demands and counterclaims were restated as ordered, although Claimant Botani did not restate its claims timely.  However, as finally restated, the claims were:

A.    By Botani, claims of (1) breach of contract; (2) tortious interference with business relations; and (3) promissory estoppel.  These claims were denied by IPF.

B.    By IPF, counterclaims of (1) breach of contract; (2) breach of duty of good faith and fair dealing: and (3) conversion.  These claims were denied by Botani.

---

[5] The law firm sending this letter to IPF recited: "This firm represents SZY Holdings, LLC ("SZY"). SZY is an assignee and beneficiary under certain product distribution agreements dated April 14, 2020 with FarFromBoring Promotions (FFB) and IPF Sourcing, LLC (IPF)." Ex. 13.  The only Product Distribution Agreement between IPF and FFB introduced in evidence is dated April 23, 2020. (Ex. 1) See ¶

C.      Neither party subsequently sought to amend its asserted claims or counterclaims.

15.      The pre-hearing phase of this arbitration was both unusual and quite contentious. Botani was sequentially represented by three different law firms. The first Denver firm, which appeared shortly after Garcia's June 27, 2020 filing of Botani's arbitration demand, withdrew on the basis of undisclosed circumstances by Notice of Withdrawal on September 21, 2020. The second Denver firm entered its appearance on October 30, 2020, but attempted to withdraw by Notice of Withdrawal on December 21, 2020, after the first preliminary conference on December 14. I initially denied permission to withdraw until a hearing could be held, but ultimately permitted withdrawal on January 26, 2021 when it became clear that Garcia had terminated the representing attorney. Garcia then attended a scheduled telephone hearing on February 24, 2021 (after failing to attend an earlier scheduled hearing on February 2) and advised that he intended to act as the non-attorney representative of Botani.[6] While I strongly advised the desirability of having an attorney as representative, he insisted he was familiar with JAMS Rules and was capable of representing Botani in this matter, so I permitted his appearance as the authorized representative of Botani, and several procedural issues were then addressed.

16.      About April 1, 2021, a third attorney, Mr. Faragalla from Miami, Florida, commenced representation of Botani through filing an undated pleading on about that date. He attended a scheduled telephone hearing on April 7, which Garcia did not attend. He did not appear in substitution of Garcia as Botani's representative, and Garcia has continued to file various matters on his own without participation of counsel, as he had also done prior to this time, so I have continued to treat him as a co-representative of Botani, based on his appearance and representations to me on February 24. At the April 7 hearing, this matter was set for Final Hearing for two days on October 13 and 14, 2021.

17.      Several discovery disputes arose subsequent to the April 7 teleconference. On June 11, 2021 I issued an Order Compelling Discovery against Botani, with which it then refused to comply. I subsequently issued an Order imposing sanctions on Botani for its refusal to comply with the Order Compelling Discovery. That Order No. 11 dated August 19, 2021, struck and dismissed all of Botani's claims against IPF as an appropriate sanction, leaving in place IPF's counterclaims. Prior to issuing that Order, I learned that Garcia had terminated Botani's third attorney, Mr. Faragalla, on June 28, 2021 because of dissatisfaction with his representation. This was one week after Botani's refusal to comply with the Order Compelling Discovery. The detailed circumstances surrounding these violations and the consequent imposition of sanctions are fully explained in my August 19, 2021 Order No. 11, the contents of which are specifically fully incorporated in this Final Order and Award. There is no need to repeat such contents here.

18.      In that Order No. 11, as well as in certain subsequent Orders, I made clear that the parties would be required to proceed to Final Hearing on the previously scheduled dates of October 13 and 14, 2021, to resolve IPF's pending counterclaims. On October 5, 2021, more than three months after Faragalla was terminated and just one week before Final Hearing, yet a fourth set of attorneys sought to

---

[6] JAMS Rules do not require a party in arbitration to be represented by an attorney, though they do require a fictional corporate entity such as an LLC to have an actual live person as its representative. See JAMS Comprehensive Rule 12(a).

make a limited entry of appearance, specifically to delay the Final Hearing. I denied any continuance by my Order No. 17 of October 11, again fully incorporated herein. Despite other efforts by Botani to delay, Final Hearing on the merits was ultimately held as scheduled, by video Zoom as previously agreed by the parties, and completed on October 13, 2021. IPF attended through counsel and presented three witnesses and multiple exhibits. Botani and its representative and CEO Garcia had full knowledge of the time, place and occurrence of the hearing, and contact information to participate via Zoom video or by telephone, but did not appear.

## III.   Additional Findings of Fact and Conclusions of Law –IPF's Counterclaim of Breach of Contract

19.    Purchase Term # 5 of the April 28, 2020 Invoice contract between Botani and IPF states: "This agreement will be governed and construed in all respects in accordance with the laws and regulations of the State of Colorado."

20.    IPF's agreement to purchase 1,330,000 units of hand sanitizer from Botani constitutes a contract for the purchase and sale of goods. The governing law for determination of rights and duties under the agreement is largely found in Colorado's version of the Uniform Commercial Code, Title 4, Article 2, Sales. See in particular C.R.S. § 4-2-204 providing the requirements for formation of a contract for sale of goods. Given the evidence presented at Final Hearing, I conclude that the agreement between Botani and IPF, as memorialized primarily in the Botani Invoice document dated April 28, 2020 and signed by both parties (Ex. 4), was a validly formed contract, and that the time of formation was no later than April 28, 2020.

21    The Invoice agreement did not contain a specific date for performance by pickup availability of the first 1,330,000 units by Botani. However, again based on the testimonial evidence presented at hearing by IPF's witnesses, both before and after April 28 the parties had consistently and repeatedly discussed IPF's potential purchase of up to 9,000,000 units of hand sanitizer from Botani, and possibly more, with the 1,330,000 units being the "first tranche," to be delivered within 10-14 days of payment of the deposit, and several other deliveries to be made in roughly similar time periods thereafter. Garcia had assured IPF that Botani had the capacity to fulfill these expectations. See also Ex. 3, the "comments" section of the two purchase orders which IPF member Thomas e-mailed to Garcia on 4/28/20:[7]

A.    <u>PO# 2020-0422-1048  (for 9,000,000 units at $3.75 = $33,750,000)</u>

Comments "Notes: Supplier to provide NDC, SOS Certificate, MSDS Label showing Ingredients and directions, packaging Information to include units per carton, # of cartons per pallet, pallet size and weight. *Supplier to provide volume and production schedule for buyer pickup. Desired fulfillment completion within 9 weeks.* Frequent additional renewal of consecutive 9 million unit orders for 27 weeks." (Italics supplied)

---

[7] Thomas' April 28, 2020 e-mail forwarding these Purchase Orders to Garcia stated: "Rico, I've updated the first Purchase Order to reflect your price to us per unit cost. The second Purchase Order is for the deposit required for the first tranche of product being delivered. Please send the proforma invoice for this deposit, so that we can [sic] the attorney to wire those funds to you tomorrow."

B.    <u>PO# 2020-0422-1048-A (for 1,330,000 units at $3.75 = $2,493,750)</u>

Deposit – 50% for first tranche of order to be delivered (for 1,330,000 units at $3.75 = $2,493,750)

Comments "Notes: 50% Deposit for Purchase Order 2020-0422-104 first tranche"

Arora, Alexandropoulos, and Thomas for IPF were all consistent that the parties' mutual discussions with Garcia were that Botani would deliver or make available for pick-up the first 1,330,000 units of hand sanitizer within 7-14 days or 10-14 days after Botani received the requested 50% deposit. The evidence also established, through undisputed testimony of Arora, that delivery would be made by pick-up,[8] as he testified that IPF's customer FFB was to supply the trucks to pick up the goods. The fact that these particular mutually understood terms were not mentioned in the Invoice agreement does not cause failure of the contract for indefiniteness under the circumstances established. See C.R.S. § 4-2-204. Under C.R.S. § 4-2-209 (1), "The time for shipment or delivery or any other action under a contract, if not provided in this article or agreed upon, shall be a reasonable time." Such a determination is one for the fact finder, based on the circumstances of the case, good faith, and reasonable standards. See Comments 1 and 3.

22.    Botani received its requested 50% deposit, in the sum of $2,493,750 on April 29, 2020, making the appropriate performance date on or about May 13, 2020. The undisputed evidence reflected that Botani did not make the first 1,330,000 units available for pickup by that date, but instead offered several excuses for non-performance and continued to assure IPF that performance would occur soon. One of the several excuses provided by Garcia was that he had entered into an agreement with one Hui Lin, representative of a company in China, to manufacture or otherwise supply the hand sanitizer, and that that agreement required him to send the deposit money to China to complete fabrication and shipment of the hand sanitizer. In sworn answers to interrogatories later propounded by IPF, Garcia also expressly represented that he had entered into a contract with one Hui Lin on May 10, 2020 to manufacture or supply the hand sanitizer, and had wired to Hui Lin $2,428,750 in furtherance of that contract on May 11 (Ex. 17, responses 1 and 2).[9] In response to IPF's related

---

[8] This was not an unstated term, as the second page of the Invoice Agreement, just below the signature blocks, states: "Additional Terms: 50% Deposit Invoice the remaining 50% is due prior to pick-up."

[9] These "Claimant's Amended Response to First Set of Interrogatories of IPF Sourcing LLC" were entirely undated, although they appear to have been received by JAMS on about June 18, 2021. They are sworn to and signed by Rico Garcia as: "I, Representative of BOTANI LABS, ..." This document is illustrative of several other documents filed by Mr. Garcia in this case after the Arbitrator approved his request to act as Botani's non-attorney Representative pursuant to JAMS Rule 12(a) at a telephone hearing on February 24, 2021 (See my Order No. 5 dated March 1, 2021.) At that time, Botani had no attorney, its previous first attorney having withdrawn under unexplained circumstances, and its second attorney having been terminated by Botani in December 2020 or January 2021. Botani engaged a third attorney, Michael Faragalla of Miami, Florida, on about April 1, 2021, but Garcia also

Requests for Production to see the purported contract between Botani and Hui Lin and Botani's bank statements from Chase Bank for April and May 2020,[10] Botani ultimately produced 8 pages of bank statements for the two requested months, but addresses and meaningful entries were almost totally redacted. A few small entries were not redacted, one reflecting Botani's receipt of an electronic transfer of $2,493,750 from the Walckner law office on 4/29/20, and the other showing a 5/11/20 wire transfer in the amount of $2,428,750 reading as follows: "05/11 Domestic Wire Transfer Via Bk Amer Nyc02600 REDACTED Ben: Hui Lin Ref: Payment For Agreement Imad: REDACTED..." (Ex. 15, 16). Similarly, the 3-page purported Chinese contract was almost entirely in Chinese characters, with addresses (except Botani's) redacted. Without further explanation or justification, Botani subsequently did not comply my June 11, 2021 Order Compelling Discovery requiring production of these same documents and other withheld items in unredacted form. This blatant withholding of apparent relevant information was a major basis for my subsequent Order No. 11 of August 19, 2021, imposing severe sanctions by dismissing Botani's claims.

23.     Following Botani's, failure to comply with my discovery Order, IPF obtained Botani's unredacted April and May 2020 Chase Bank records pursuant to a valid subpoena. These unredacted records obtained directly from Chase Bank on 7/13/21 unquestionably reflected that the readable entry on 5/11/20 of the redacted records produced by Botani had been substantially altered by forgery; and that the improper redactions also masked notations of at least 3 other highly concerning transactions in the account immediately after Botani received the deposit money from the Walckner law firm on April 29:

A.     a $104,000 electronic withdrawal by wire transfer on 5/1 to U.S. Bank, account of Hui Lin in Aurora, Colo. "Ref: Payment in Full for Farming Loan Agreement 04/01/2019/Benf/Hui Lin/...";

B.     a $54,373.47 electronic withdrawal on 5/5 to Capital One Auto Carpay;

C.     a $2,428,750 electronic withdrawal by wire transfer on 5/11 through Bank of America Nyc to Bank of America Las Vegas, NV Ben: Hamsa Holdings LLC Ref: Land Purchase .

---

continued to file some documents on his own as Representative, without an attorney's participation, throughout this case. These Amended Interrogatory Responses were submitted in response to an earlier objection letter from IPF's attorney to Faragalla, but Faragalla did not sign the Amended Responses, though they were full of asserted objections which attorneys generally have to sign. Botani subsequently terminated Mr. Faragalla, its third attorney, on June 28, 2021. On October 5, 2021, just a week before scheduled Final Hearing, yet a fourth set of attorneys attempted to obtain a delay of final hearing by submitting a "limited entry of appearance" for the sole purpose of filing a motion for continuance. I ordered these attorneys to file a proper motion citing grounds for a continuance, which they did on October 7. Respondent IPF filed its objection on October 10, and I denied the Motion for Continuance on Oct. 11. Neither this new law firm nor Mr. Garcia appeared at the Final Hearing, though Garcia had full contact information of how to appear, either by Zoom or by telephone, and had been calling JAMS as late as 30 minutes before commencement of hearing. However, on October 7 Garcia had disconnected his e-mail address of record and changed to a new e-mail without notifying JAMS. JAMS' only reliable way to communicate with him after that point, unless he called JAMS, was through Botani's telephone number, which no one answered.

[10] Botani's Chase bank account to which the deposit funds were wired on April 29, 2020.

Additionally, the unredacted bank records produced pursuant to subpoena lacked any entry on 5/11 or any other date evidencing a purported transfer of $2,428,750 from Botani to "Hui Lin Ref: Payment for Agreement...", as was reflected in the redacted records produced by Botani. That purported entry was purely fictitious.

24.     On August 11, 2021, just 2 days before another scheduled telephone hearing on August 13, IPF filed a second motion for sanctions, revealing that it had succeeded in obtaining the unredacted Chase Bank records. IPF pointed out the critical information which had been masked in Botani's production, and also demonstrated that Botani's production had been altered by forgery from the genuine bank statements. As an additional ground for sanctions, IPF further demonstrated that the entity known as "Hamsa Holdings, LLC" to which Botani had apparently transferred $2,428,750 on May 11 according to the unredacted genuine records, was in fact a Nevada LLC created by a filing with the Nevada Secretary of State on 5/4/2021. (Ex. 18). That filing reflected Rico Garcia as a Member and the authorized signer, and, strangely enough, listed Hamsa Holdings, LLC itself as the Managing Member and registered agent. All signature blocks in the initiating forms were typed in rather than actually signed. (Ex. 18).

25.     Because this information was made known in these proceedings only by IPF's August 11 motion, I did not address it during the August 13 hearing and did not consider it in imposing my original sanctions against Botani on August 19. Instead, I allowed Botani a reasonable time to respond to the motion and this new information. Botani by Garcia did respond on August 24 and 27, but never addressed the glaring discrepancies revealed by IPF or the fact that bank documents produced by Botani had clearly been altered to appear consistent with Garcia's sworn interrogatory responses. Faced with this total lack of explanation of what appeared to be false and fraudulent discovery responses from Botani or Garcia, I deferred ruling on IPF's pending request for additional sanctions until Final Hearing, with the expectation that Garcia might appear and provide some reasonable, exculpating account. Such did not occur.

26.     Irrespective of these serious discovery violations, the evidence presented that IPF had performed its part of the parties' April 28, 2020 Invoice Agreement by advancing the deposit, and stood ready to perform its remaining obligations with respect to this first tranche of hand sanitizer. Botani, on the other hand, did not. It never delivered any hand sanitizer, nor does it appear from the evidence that it intended or would ever have been able to, since a substantial portion of the agreed purchase price had been improperly diverted to a separate entity in which Garcia held a significant, if not total, interest. Botani, through Garcia, never disclosed or acknowledged this diversion, in fact attempted to hide it, until IPF ferreted out the incriminating information by valid process. Under these circumstances, I find and conclude that Botani did not perform its contractual obligation to make available the product within a reasonable time, and therefore breached its agreement with IPF, subjecting it to IPF's claim for damages.

27.     Additionally, I find and conclude that IPF has established an additional path by which it may obtain the relief it seeks on its breach of contract counterclaim. Under C.R.S.§ 4-2-609(1), Botani's failure to deliver the first tranche of hand sanitizer within a reasonable time, under the demonstrated facts and circumstances of this case and the multiple excuses being advanced for delayed performance, gave IPF proper grounds to feel insecure with respect to ultimate performance by Botani, either within a reasonable time or at all. By June 10, 2020, 42 days after $2,493,750 had been released to Botani, IPF had still not been given a firm delivery date with respect to the first tranche by Botani. 28 days had passed since May 12, the day on or about which IPF reasonably expected delivery based on the parties' discussions. IPF was entitled, at least by this point, to seek adequate assurance of due performance. C.R.S. § 4-2-609 (1).

28.     On June 10, IPF through counsel made written demand upon Botani for adequate assurance of future performance. (Ex. 12). I find such demand was justified under the facts established. IPF demanded performance by delivery of the first tranche of hand sanitizer within 14 days, on or before June 24, in default of which it would exercise its right under C.R.S. §4-2-609(1) and (4) to terminate its contract with Botani and demand return of the entire deposit of $2,493,750 which Botani had received on April 29. It also demanded that if Botani had knowledge that it could not provide delivery by June 24, it should so advise IPF immediately. It also requested Botani to respond to the demand letter by June 12.

29.     There has been no evidence presented to me that Botani ever responded to this letter, either on June 12 or thereafter. I have no evidence that Botani provided any assurance that it could deliver the product in question by June 24 or thereafter. I find and conclude that Botani's failure to make any response to the June 10 demand letter or to provide reasonable assurance of due performance under the circumstances amounted to a repudiation of the contract on Botani's part, resulting in breach by Botani. C.R.S. § 4-2-609 (4).[11]

## IV.     Additional Findings of Fact and Conclusions of Law -- IPF's Counterclaim of Breach of Good Faith and Fair Dealing

30.     Under Colorado law, every contract contains an implied duty of good faith and fair dealing. The good faith performance doctrine is "used to effectuate the intentions of the parties or to honor their reasonable expectations" and "to protect a 'weaker' party from a 'stronger party.'" *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995); *McDonald v. Zions First Nat'l Bank,* 348 P.3d 957, 967 (Colo. App. 2015). Even Colorado's version of the UCC has an express definition of the obligation of good faith, found at C.R.S. § 4-1-304:

> Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement.

---

[11] Under C.R.S. § 4-2-609(4), failure to provide adequate assurance of due performance after justified demand results in an <u>automatic</u> repudiation after 30 days. However, the facts and circumstances of an individual case can give rise to a finding of such repudiation within a shorter time frame. I find that such is the case here. See § 4-2-609, Comment 2, third paragraph.

31.     However, application of the good faith doctrine is generally limited to situations "…when one party has discretionary authority to determine certain terms of the contract, such as quantity, price or time." *Id.* Discretionary authority "occurs when the parties, at formation, defer a decision regarding performance terms under the contract." *Id.*

32.     IPF's contention that the good faith doctrine is applicable here is based on its argument that Botani had discretionary authority as to when to deliver the first tranche of hand sanitizer, and that, in bad faith, it did not so within a reasonable amount of time. This was not a decision that the parties intentionally deferred to the future, and the UCC itself fills in this absence with a "reasonable" test to avoid unfairness. IPF also contends that Botani utilized the advanced deposit money for an improper purpose, demonstrating bad faith. (See IPF's Position Statement of October 6, 2021) However, my findings and conclusions in this case regarding breach of contract are not based on any abuse of discretion by Botani. Rather, I have concluded that Botani directly breached the contract itself, by failing to perform its contract obligations within a reasonable time, by disregarding the mutually understood purpose of the deposit money, and by diverting that money to the apparent personal benefit of an entity owned by Botani's sole officer and member rather than utilizing it for the contracted purpose. While these actions by Botani may properly be characterized as in bad faith in the generic sense, they did not constitute wrongful exercise by Botani of some discretionary power under the Invoice Agreement—they represent the very actions which I have concluded are the underpinnings of IPF's breach of contract claim. The doctrine of good faith and fair dealing as it is enforced in Colorado simply is not applicable here.[12]

## V.     Additional Findings of Fact and Conclusions of Law -- IPF's Counterclaim of Conversion

33.     Under Colorado law, conversion is "any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Glenn Arms Associates V Century Mortgage and Investment Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984) (quoting from *Byron v. York Investment Co,* 296 P.2d 742 (Colo. 1956). See also *Scott v. Scott*, 428 P.3d 626, 634 (Colo. App. 2018). A successful assertion of the tort claim of conversion, which occurs at the time the converter took dominion over the property, also requires that the owner demand return of the property, and the controlling party's refusal to do so. *Id.*

34.     The evidence offered by IPF establishes that Botani received the total deposit of $2,493,750 into its Colorado bank account by wire transfer on April 29, 2020. Receipt was pursuant to a valid contract for sale of goods between Botani and IPF. Just before wire delivery of these funds, Botani's receiving bank account contained a balance of $207, 628.31 ($207,628.31 plus $2,493,750 =

---

[12] Comment 1 to C.R.S. § 4-1-304 reads in part: "This section sets forth a basic principle running throughout the Uniform Commercial Code. The principle is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties…. <u>This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract.…</u>" (Underlining supplied).

2,701,378.31, the closing balance showing on April 29) (Ex.15). Only one further April transaction occurred in the account on April 30, a $2.99 recurring card charge to Apple.

35. There is no dispute in the evidence that the $2,493,750 amount transferred to Botani on April 29 was both transferred and received for the specific purpose of Botani's commencement of the manufacture or search for the 1,330,000 units of hand sanitizer it had agreed to provide. However, during the following 29 day period (May 1 through 29) Botani made withdrawals or charges against the account which reduced its month-end balance to $93,088.69.[13] At least three of these charges are highly concerning, one of which is overwhelmingly inculpating of Botani:

A. A May 1 domestic wire transfer of $104,000 to Hui Lin as "Payment In Full for Farming Loan Agreement 04/01/19/Bnf/Hui Lin". Because the Botani bank account balance exceeded this amount on May 1, there is no firm basis to conclude that this was unauthorized dominion over the funds transferred on the authority of IPF. However, there is no reason to believe that these funds were expended to obtain hand sanitizer.

B. A May 5 electronic withdrawal of $54,373.47 to Capital One Auto Carpay. Given the amount of this transfer and the named recipient, it is highly likely that these funds were used to purchase a car, or to pay off an existing car loan. Again, the amount is within the existing balance on Botani's account as of May 5 without considering the April 29 receipt, so again there is no firm basis to conclude that this transfer represented unauthorized dominion over the recently transferred IPF funds.

C. A May 11 domestic wire transfer of $2,428,750 to Bank of America in Las Vegas, Nevada, "Ben Hamsa Holdings LLC Ref: Land Purchase." Looking at Botani's bank records for the month of May, it is indisputable that the funds wired in this May 11 transfer must have been almost, if not totally, the specific funds transferred to Botani by IPF. Moreover, because Botani's account was depleted from $207,628.31 as of April 29 (prior to the IPF transfer) to $93,088.69 by May 29 (with only $4,527.23 added to the account during the month), it is mathematically indisputable that Botani exercised and depleted for its own or Garcia's purposes the entire $2,493,750, since none of the other charges against the account bear any apparent relationship to the manufacture or other acquisition of hand sanitizer. Therefore, I find and conclude that Botani through its CEO and Managing Member Garcia exercised unauthorized dominion or ownership over the entire amount received from IPF, and this exercise occurred or was completed no later than May 29, 2020.

D. It is worth mentioning that these bank records of Botani, in their unredacted form, were the very records which Botani refused to produce during discovery, leading to the sanction of dismissal of its claims. It is perhaps no surprise that neither Mr. Garcia, nor any other representative of Botani, chose to produce these records in unredacted form, or to appear at final hearing to attempt to provide some legitimate explanation for what they appear to show.

---

[13] During the month of May, there were only $4,527.23 credits to the account, all of those being charge reversals or card purchase returns from Airbnb for the period from May 14 through May 21.

36.     IPF also met the requirement of demand for return of the entire deposit by its counsel's letter of June 25, 2020 (Ex.14).  Botani did not respond to or comply with that demand letter.  It did not, and has not to this day returned any of the money, nor provided a believable or even unconvincing explanation of where it might be, other than it may be in the hands of one Hui Lin somewhere in China.  Nor has Botani ever made available any of the hand sanitizer at issue in this case.

37.     The final element which IPF must prove to establish a claim of conversion is that it is the rightful "owner of the personal property," the $2,493,750 at issue here.  The evidence revealed that these funds originally came from FFB (FarFromBoring Promotions), IPF's "customer" or "client" which sought to use IPF as a source for delivery of 9,000,000 units of hand sanitizer over a 5-week period from May 4 through June 8, 2020.  FFB and IPF entered into a Sourcing Agreement made effective as of April 23, 2020 (Exhibit 1), a 7-page agreement with a 1-page Work Order attached.[14]  The Work Order detailed the product, price, and delivery and payment schedules for six different batches or "tranches" of 16 oz. units of hand sanitizer with pump top, totaling 9,000,000 units, for a total price of $37,800,000.  According to the Work Order, the first payment of $5,200,000 was to be made on April 24, described in the Work Order as "Deposit for Order #1-6."  The first delivery of 1,330,000 units was to be made on May 4.  Thereafter, FFB was scheduled to pay approximately in advance for each tranche or batch, with $0.00 payment due on June 8 for delivery of the last tranche of 650,000 units.

38.     To facilitate the transaction between FFB and IPF, they also made arrangements to establish what the parties have referred to as an "escrow account."  This account was in fact a Paymaster Service Agreement arranged with the Walckner Law Office of Worcester, Mass., and governed according to its terms by Massachusetts law (Ex. 2).  In this arrangement, the Walckner Law Office was described as "a neutral third-party offering secure handling of money in transactions concerning purchases, service contracts, construction projects, and management of Investor funds." (Ex. 2, ¶1.1).  The Agreement further defines the "Depositor" as "the individual business entity funding all transactions under this Agreement."   It further describes the "Recipient and Recipients" as "the individuals and/or business entity identified as receivers of money transfers." (Ex.2, ¶¶ 2.3 and 2.4).  It also states that the Recipient or Recipients and the Depositor are the only Parties to the Agreement, and that the Walckner Law Office is expressly not a Party. (Ex. 2, ¶ 2.5).  In the document (Exhibit 2) provided to me, the only identification of the actual Parties to this Agreement are found on p.5, the signature page.  There, the "Depositor" name, hand-printed, is one Sheldon Perl, below an entirely illegible cursive signature.  The "Recipient" named is IPF Sourcing.[15]

39.     IPF also produced in evidence an additional pre-printed version of the Paymaster Service Agreement with the Walckner Law Office (Ex. 6), identical in form and  wording to Exhibit 2, except on page 5, where it bears the signature of Rico Garcia over the printed words "Signatory Name" and "Recipient Name", and is stamp-dated 04/28/2020.  Ex. 6 also has two additional pages, the first identifying Botani-Labs, LLC as the "Recipient" and Rico Garcia as the Authorized Signatory.  It also

_____

[14] The Sourcing Agreement and the attached Work Order were actually signed by Gia-Maria Vacca, identified as FFB's CIO, on April 27, 2020.
[15] The Exhibit 2 which has been produced in evidence may be an incomplete copy of a more fully signed Agreement in control or possession of some other person or entity.

contains contact information for Botani and for Botani's bank and bank account in Castle Rock, Colorado. The second additional page is blank. This Ex. 6 does not appear to identify any Depositor.

40. Neither of these two Paymaster Service Agreements in the form presented to me contain any instructions pertinent to the actual transactions involved here. They do state that, in the event of any disagreements between the Depositor and the Recipient(s), they "may elect to seek recourse as permitted under the contract between the Depositor and Recipients or applicable law. (¶7.2). The Agreements also provide that in the event of disputes, Walckner Law Office will release funds held by it to Recipient, or refund funds held by it to a Depositor, only upon the express written authorization of both parties, or pursuant to a court order. (¶¶ 7.3, 7.4).

41. Finally, in these two Agreements, Section 4, Disbursements, the Agreements provide that once funds are deposited with the Walckner Law Office under the Agreements, "No disbursements will be made unless authorized by the Depositor" (¶ 4.1), and "No monies will be returned to the Depositor without the prior written consent of all Recipient named in this agreement, if any" (¶ 4.6).

42. It is my understanding, based on information before me in this case, that there is litigation currently pending in the U.S. District Court for the Eastern District of Virginia among, FFB, IPF, and another entity known as SZY Holdings, LLC to determine ultimate liabilities and rights among them with respect to their hand sanitizer transaction. Neither SZY Holdings nor FFB were named parties to the Invoice Agreement between IPF and Botani, which would otherwise subject them to arbitration. IPF, as Counterclaimant, has provided me with no Colorado case authority as to proper treatment of funds coming from escrow accounts. The authorities I have researched are of little assistance, as they address competing claims of parties to property still held in escrow, not funds which have been legitimately released. See, e.g. *Colo. Mortgage Co. v. Nolan*, 347 P.2d 778 (Colo. 1959); *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186 (Colo. App. 2008). The cases do look to the terms of the escrow agreements themselves, but this approach is of little help here. However, considering the entire facts of this case, the terms of the IPF-FFB Product Distribution Agreement (Ex. 1), the two Paymaster Service Agreements, and the relevant conduct of the various involved persons and entities, I find and conclude that IPF did have sufficient indicia of ownership of the $2,493,750 disbursed to Botany by Walckner Law Office on April 29, 2020 to meet this property ownership requirement of an actionable conversion claim. Whatever paperwork problems or lapses might appear in the documents placed in evidence before me, it is clear that IPF had sufficient status and authority as a Depositor under Exhibit 2 to authorize and obtain release of the funds in question to Botany as Recipient on April 28, resulting in their actual disbursement to Botani on April 29. Claims of conversion of cash or money were disfavored under the common law due to its fungible character and the likelihood of indistinguishable commingling with other funds. See *Johnson v. Studholme*, 619 F. Supp. 1347, 1350 (D. Colo. 1985), *aff'd sub nom Johnson v. Hendricks*, 833 F. 2d 908 (10th Cir. 1987). Colorado now rejects that approach where the identifiable money was intended for a specific purpose, and where circumstances allow a particular fund to be specifically identified .*Rhino Fund, LLLP v. Hutchins*, 215 P.3d at 1196. Such is the case here. I therefore find and conclude that Botani, through its officer and managing member Rico Garcia, converted the entire $2,493,750 for Botani's or Garcia's own benefit beginning on May 11, 2020 by the wire transfer from Botani's account to Hamas, LLC and during the remainder of May 2020; that Botani has never returned

these funds to IPF despite its demand for return; and that IPF is entitled to a judgment against Botani in the amount of $2,493,750, plus interest accruing from at least May 29, 2020 to the date of this award as described below on its claim of conversion.


## VI.    Compensatory Damages, Including Interest

43.    Given my findings and conclusions as stated in Sections III (Breach of Contract) and V (Conversion) above, I further find and conclude that Claimant IPF is entitled to damage awards against Respondent Botani in the amounts stated in the below paragraphs.  Despite Mr. Garcia's active involvement in Botani's breach of contract and conversion, he is not a party to this arbitration and no award has been sought against him.

44.    With respect to IPF's claim of breach of contract, I find that the correct measure of damages is the same whether I consider Botani to have breached the contract directly by its failure to perform its material obligations, or whether I consider Botani to have repudiated the agreement by failure to provide reasonable assurance of performance when requested by IPF, resulting in justifiable termination by IPF. See C.R.S. § 4-2-711(1), "Buyers remedies in general- buyer's security interest in rejected goods." I find breach, or repudiation and termination, to have occurred no later than June 25, 2020.  The only relief sought by IPF for which it has provided evidence is return of the full $2,493,750 deposit delivered to Botani on May 29, 2020, to which I find it is entitled.  IPF has also requested pre-judgment interest be awarded.  I find and conclude that Botani has wrongfully withheld $2,493,750 from IPF from and after June 25, 2020 when IPF demanded its return.  Under C.R.S. § 5-12-102(1)(b), IPF is entitled to prejudgment interest on the amount of money wrongfully withheld from the date of wrongful withholding or after the date it becomes due at the rate of eight percent per annum, compounded annually, until the date of this Final Award; and at the same rate from date of this Final Award until the Award is reduced to judgment or otherwise satisfied, whichever comes first.

45.    With respect to IPF's claim of conversion, I find and conclude that the conversion of the entire amount of $2,493,750 was completed no later than May 29, 2020.  Under Colorado law, IPF is entitled to prejudgment interest on the full amount at the legal statutory rate of eight percent per annum, compounded annually, from the date of conversion, also under C.R.S. § 5-12-102(1)(b), to the date of the Final Award, *Glenn Arms Associates*, 680 P.2d at 1317; and at the same rate from date of this Final Award until the Award is reduced to judgment or otherwise satisfied, whichever comes first.


## VII.    Reallocation of Arbitrator Expenses

46.    As part of its request for relief, IPF requests that it be awarded those expenses which it incurred to resolve this dispute in arbitration, including those expenses which it advanced on Botani's behalf to obtain relief from administrative suspension of the case when Botani failed and refused to pay its agreed 50% share of an estimated advance charge for the proceedings to go forward to Final Hearing.

JAMS Rule 24(f) permits such relief, and I find it appropriate in this case to charge all of IPF's arbitration expenses to Botani by reallocation.

47.     JAMS records reflect that IPF paid or advanced the following amounts to JAMS in this matter to satisfy case setup fees, administrative fees, and arbitrator's fees:

    7/16/20 ------------ $1,750

    9/22/20 ------------ $750

    7/21/21 ------------ $21,930

                $24,430

IPF also advanced the additional sum of $21,942 on behalf of Botani, which refused to pay this amount when it became due, necessitating that the case be administratively suspended until one of the parties paid the delinquent amount. IPF paid it on 9/26/21 so that the arbitration could move forward. IPF is also entitled to have that amount added to the final award pursuant to JAMS Rule 31(c). Accordingly, IPF is awarded the sum of **$46,372** against Botani through reallocation of Arbitrator and arbitration expenses.

## VIII.    Attorney Fees and Costs

48.     IPF has also requested it be awarded its attorney fees and costs incurred in this arbitration. IPF has tendered evidence of $86,560 in attorney fees and $87.59 in costs. (Ex. 20, 21).

49.     JAMS Rule 24(g) provides: "The Award of the Arbitrator may allocate attorney's fees and expenses and interest ... if provided by the Parties' Agreement or allowed by applicable law." C.R.S. § 13-22-221(1) likewise provides: "An arbitrator may award reasonable attorney fees and other reasonable expenses of arbitration if such an award is authorized by law in a civil action involving the same claim or by the agreement of the parties to the arbitration proceeding."

50.     The parties' written agreement, the April 28, 2020 Invoice, does not contain any provisions allowing for award of attorney fees to the prevailing party in a dispute, in this case IPF. Nor has IPF referred me to any independent "law" relevant here that substantively allows or mandates fee awards. In fact, Colorado "applicable law" follows the "American Rule," which precludes the award of attorney fees to a prevailing litigant absent contractual, statutory, or procedural rule providing otherwise. *City of Wheatridge v. Cerveny*, 919 P.2d 1110,1114 (Colo. 1996) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975) and *Buder v. Sartore*, 774 P. 2d 1383, 1390 (Colo. 1989). Though the equities in this case would surely support a generous fee award under proper circumstances, the facts and the applicable law do not permit such relief.

51.     The same statutes and JAMS Rule cited in paragraph 49 above do allow me to award a prevailing litigant its costs. Under Colorado law, a prevailing party is generally accorded its reasonable

costs as a matter of course, pursuant to C.R.Civ.P. 54(d), C.R.S.§ 13-16-104, and C.R.S.§ 13-16-105. Here. The only proof of costs IPF has submitted is for three courier charges in the total amount of $87.59. I find these expenses reasonable in amount and necessarily incurred in the pursuit of IPF's claims in this case. **$87.59** will be included as part of the Award to IPF in this case.

## IX.    Exemplary Damages

52.    IPF also seeks an award of exemplary or punitive damages in connection with its successful tort claim of conversion against Botani. IPF alleged in its initial counterclaims in this case the facts supporting the claim of conversion of $2,493,750, that the conversion was done "with malice or a wanton disregard of IPF's rights," and specifically requested an award of punitive damages as part of its prayer for relief on that claim. See ¶¶ 31-37 of Count III and ¶ 3 of Prayer for Relief in IPF's January 7, 2021 Counterclaim.

53.    In addition to selecting the laws of the state of Colorado as their governing law, the parties have clearly adopted JAMS Rules (here, the Comprehensive Rules) to resolve their dispute. JAMS Rule 24(c) provides:

> In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

54.    There is no provision in the JAMS Rules which specifically prohibits or constrains the Arbitrator from awarding exemplary damages in an otherwise appropriate case. As to Colorado law, the authority to award exemplary damages is found at C.R.S. § 13-21-102, which provides in part:

> (1)(a).   In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages ….

The statute also recites:

> (5)    Unless otherwise provided by law, exemplary damages shall not be awarded in administrative or arbitration proceedings, even if the award or decision is enforced or approved in an action commenced in a court.

55.    However, the Arbitrator's authority to award exemplary damages overriding subsection (5)'s restriction is "otherwise provided by law." See *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995). The case between Botani and IPF is clearly one evidencing a transaction in commerce, making the Federal Arbitration Act applicable. 9 U.S.C. § 2. *Mastrobouno* and its progeny are grounded on the strong national policy favoring arbitration, as manifested in the Federal Arbitration Act, which, in

matters involving interstate commerce, essentially pre-empts state efforts to restrict arbitration remedies where the parties have bargained for them. 514 U.S. at 56.[16] Moreover, JAMS Rule 25 provides in part:

> **Enforcement of the Award.** Proceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, or applicable state law. The Parties to an Arbitration under these Rules shall be deemed to have consented that judgment upon the Award may be entered in any court having jurisdiction thereof.

Based on these authorities, and the clear applicability of the FAA, I conclude that the *Mastrobuono* decision of the U.S. Supreme Court and the arbitration principles of the FAA dictate that subsection (5) cannot override the right of parties in arbitration to awards of punitive damages in appropriate cases, such as the one here.

56.    Considering all the facts demonstrated in this case as recited previously, I find that IPF has clearly met the requirement of demonstrating that Botani's actions, through its only apparent human actor Garcia, in converting IPF's funds, were attended by circumstances of fraud, malice, and willful and wanton conduct. While it is at least suspicious that by May 4, 2020, only 5 days after Botani received this extremely large infusion of cash, Garcia created a new Nevada LLC in which he was a member. However, Garcia, Botani's only actor, unquestionably knew by at least May 11, 2020, when he transferred $2,428,750 to Hamsa Holdings, LLC, his newly created company in Las Vegas, for a "land purchase," that he had no intention of fulfilling Botani's obligations to obtain the requisite hand sanitizer for IPF. Instead, he strung IPF along with his fictitious account of a contract with someone in China and that the funds had been sent there, both before and throughout the arbitration. Certainly the most obviously willful and fraudulent aspects of Botani's conduct in these proceedings was his resistance to basic discovery propounded by IPF; then his submission of sworn interrogatory responses containing blatant falsehoods about sending the disputed funds to China rather to his company in Las Vegas; then his attempt to alter by clear forgery and improperly redact his copies of requested bank documents before producing them; and finally, his brazen refusal to comply with an Order Compelling Discovery in an effort to hide the deceptions he had created. It was only when IPF was able to obtain the bank documents in question through the subpoena process, rather than relying on its opponent's obligation to cooperate and behave truthfully, that the nature and scope of Botani's deceptions and prevarications became clear. From that point on, Botani did little except try to delay the Final Hearing in this matter. Garcia, acting as Botani's representative, refused to make himself and another identified witness available for deposition proceedings despite IPF's efforts to arrange them. He refused to pay Botani's share of a large sum of estimated costs to enable the arbitration to go forward, forcing IPF, which wanted resolution of the dispute, to pay those fees on Botani's behalf to enable the arbitration to proceed. After terminating at least two of his three known attorneys, he brought forward yet a fourth

---

[16] *Mastrobuono* overrode a New York state court decision restricting permissible remedies in favor of the FAA's more liberal approach. The same result obtains where a state statute, like that of Colorado, attempts to restrict rights in arbitration. See *Allied-Bruce Terminix Cos. V. Dobson*, 513 U.S. 265 (1995) (rejecting Alabama statutory restrictions on arbitration remedies).

set of attorneys just a week before scheduled Final Hearing in an effort to obtain a continuance. In the meantime, Botani had done little or nothing to prepare for Final Hearing. It took no depositions, successfully blocked IPF's efforts to depose Garcia, and did not file a required statement of position, witness list, or exhibit list as required by JAMS Rules. Garcia chose not to appear at Final Hearing to defend or explain his actions or defend the counterclaims against Botani, either as a witness or as the authorized representative of Botani. And finally, Botani or its actor Garcia has never returned any of the converted funds, but has instead retained or consumed them for a benefit other that their intended purpose.

57. I find and conclude, based on the above-listed activities, that Botani's actions, through Garcia, were in fact attended by circumstances of fraud, malice, and willful and wanton conduct. I expressly make these findings supporting IPF's entitlement to exemplary damages and Botani's culpable conduct to the requisite degree of certainty for a fact finder under Colorado law, "beyond a reasonable doubt."

58. IPF has requested a punitive damage award of $2,493,750, roughly the amount of its successful award for conversion. Awards of exemplary damages, though permissible by the fact finder, are not mandatory, and the amount of such awards is within the discretion of the fact finder, subject to the restrictions of applicable law. The purpose of exemplary damages is to punish the culpable party and to deter others from similar conduct in the future. *Leidholt v. Dist. Ct.*, 619 P.2d 768, 770 (Colo. 1980). Given these purposes, I find and conclude that an exemplary damage award to IPF and against Botani of $1,000,000.00 is sufficient to satisfy the purposes of such awards, particularly that of deterring others, and appropriate under the circumstances of this case. Accordingly, I award to IPF and against Botani an exemplary damage award of **$1,000.000.00** in connection with IPF's conversion claim, in addition to its compensatory damage award. This amount shall accrue interest at the rate of eight percent per annum, compounded annually, pursuant to C.R.S. § 5-12-102 (4) (b),from date of this Award until reduced to judgment or otherwise satisfied, whichever comes first.

## X. Summary of Award

59. In summary, the total Award in favor of Respondent/ Counterclaimant IPF and against Claimant / Counterclaim Respondent Botani-Labs is as follows:

A. On IPF's Counterclaim for Breach of Contract, the sum of **$2,493,750**, plus prejudgment interest from and after June 25, 2020 as calculated in accordance with the instructions in paragraph 44 above.

B. On IPF's Counterclaim for Conversion, the sum of **$2,493,750**, plus prejudgment interest from and after May 29, 2020 as calculated in accordance with the instructions in paragraph 45 above; plus, and additional award of exemplary damages in the amount of **$1,000.000**, plus prejudgment interest on the exemplary amount from and after date of this Award as calculated in paragraph 58 above.

C.    For incurred arbitration and Arbitrator expenses as reallocated, in the amount of **$46,372**, plus prejudgment interest from and after date of this Award.

D.    For costs, in the amount of **$87.59**, plus prejudgment interest from and after date of this Award.

**XI.    Final Nature of Award**

60.    Pursuant to JAMS Rule 24(a), this Award constitutes the Final Award in this matter. The parties' deadline to request correction or other modification of the Final Award within the scope permitted under JAMS Rule 24(j) shall be calculated as 7 calendar days after the Final Award is served.

Dated this __13TH__ day of November, 2021

Norman D. Haglund

Arbitrator